UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| MYRTA DeLaCRUZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2:05-CV-192 |
| | ) | |
| GEORGE PABEY and | ) | |
| CHARLES PACURAR, individually and | ) | |
| in their official capacities as Mayor and | ) | |
| City Controller of the City of East Chicago, | ) | |
| Indiana, respectively, and the CITY OF | ) | |
| EAST CHICAGO, INDIANA, a municipal | ) | |
| corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Myrta DeLaCruz and Defendant George Pabey grew up together; DeLaCruz's mother was even Pabey's godmother. But DeLaCruz and her husband, Joe, an East Chicago city councilman, ended up at political odds with Pabey because they supported Pabey's opponent, incumbent mayor Robert Pastrick, in East Chicago's 2003 Democratic mayoral primary. Pastrick won the primary, but because the Indiana Supreme Court later voided the results due to voting fraud, a special primary was set for October 2004. According to Joe DeLaCruz, who is now in jail for his role in a scandal involving misappropriation of public funds, Pabey approached him in August 2004 to ask him to switch his loyalty to Pabey and endorse him publicly. Pabey promised that he would see that Myrta, an employee in the City Controller's office, and their son David, an East Chicago police officer, would keep their jobs if he won. Although Joe told Pabey that he could not support him outright, he would not do anything to hurt his election chances. According to Joe, Pabey was so upset at Joe's refusal that he said he had

no alternative but to fire Myrta if he won.  Pabey did win, and Myrta was fired within days of Pabey taking office.

Myrta DeLaCruz then brought this lawsuit against Pabey, Charles Pacurar, the new Controller under Pabey and Pabey's close advisor, and the City of East Chicago, claiming that her termination violated her First Amendment rights.  Defendants have moved for summary judgment, claiming that Myrta's job was eliminated through a general workforce reduction, and that no credible evidence supports her claim.  (DE 69.)  Because a reasonable jury could conclude that Plaintiff was fired in retaliation for both her husband's and her own associational rights, summary judgment is denied.

## I. FACTUAL BACKGROUND

### A. Plaintiff Begins Working for the City

In August 2003, Myrta DeLaCruz started working for the City.  She had learned from her husband, Joe, a City Councilman, that the City was hiring for positions in its new Central Purchasing Department.  (DE 71-19 at 6.)  The new department would, as the name suggests, centralize the City's purchasing instead of having each department handle its own purchasing.  (*Id*. at 9-10.)  DeLaCruz had several years of experience in purchasing from her work at LTV Steel, so she decided to apply.  (*Id*. at 6.)  She was hired by Edwardo Maldonado, the City Controller, into the position of assistant purchasing officer.  (DE 79-10 at 3.)  Initially, the plan was for DeLaCruz to report to Maldonado, but only until Anthony Mrvan, the City's personnel director, became the purchasing director.  (DE 71-19 at 7.)

DeLaCruz testified that Maldonado assigned her the tasks of weeding out old vendors from the vendor registry, establishing new vendor relationships, and obtaining new prices.  (*Id*.

at 9-10.) She was also told to implement a new commodities specifications system for the City. (*Id*. at 9.) But as Plaintiff concedes, the new purchasing department never became fully operational. (DE 79-9 at 4.) At least part of this was apparently due to the chaotic environment in city government that was created after several city officials were indicted. (*Id*. at 7.)

The Purchasing Department was originally supposed to be based at a warehouse on Chicago Avenue, but instead, DeLaCruz was moved back and forth every few months between City Hall and leased office space across the street. (*Id*. at 4.) DeLaCruz testified that she researched the commodity codes that states use for purchasing, made up purchasing forms, and generally tried to learn how to run a purchasing department. (*Id*.)

Kim Anderson, the deputy controller, testified that DeLaCruz completed at least one task that she oversaw, that of weeding out old vendors so that the vendor list used by accounting was current. (DE 71-20 at 13-14.) But the record is unclear as to how much time she spent doing purchasing activities over her sixteen months with the City, or whether she also took on other tasks unrelated to purchasing. Anderson testified that there was no centralized purchasing department during the time that DeLaCruz worked for the City; there were merely talks about moving toward a centralized purchasing. (*Id.* at 17.) Indeed, Charles Pacurar, the new Controller under Pabey, testified that, when he met with DeLaCruz to tell her she had been fired, he asked her where she worked, and she told him she was a clerk in the Water Department. (DE 71-2 at 39.) DeLaCruz acknowledged that, once Pabey took office, she was not performing any purchasing functions, and she was waiting to be called in to see what the new administration was going to do with her. (DE 71-19 at 22.)

3

**B. Pabey's Run for Mayor**

Myrta DeLaCruz and Pabey had known each other since they were children. (DE 79-9 at 5.) DeLaCruz's mother was Pabey's godmother. (*Id.*; DE 76-5 at 2.) Joe DeLaCruz also knew Pabey from childhood, and they worked together at the East Chicago Police Department. (DE 79-9 at 5; DE 79-8 at 2) Joe was also a city councilman at-large for many years. (DE 71-19 at 15.) He ran for reelection in 2003 and won.[1] (DE 71-19 at 15; DE 76-4.) According to Myrta DeLaCruz, Pabey supported Joe DeLaCruz in one of his prior campaigns for city councilman, but not in the 2003 election. (DE 71-19 at 15.) Instead, Pabey and Pacurar supported Richard Medina for councilman at-large. (*Id.* at 16; DE 76-2 at 6.)

Myrta and Joe DeLaCruz testified that they strongly supported incumbent mayor Robert Pastrick in the 2003 Democratic mayoral primary. (DE 79-8 at 2; 71-19 at 13-14.) Myrta DeLaCruz stated that her husband campaigned for Pastrick while he was out campaigning for himself. (DE 71-19 at 14.) Myrta also campaigned for Pastrick by talking to people and asking them to support him, and by putting up signs for him. (*Id.*) She stated that her entire family was supporting Pastrick, and her parents had a Pastrick sign up in their house. (DE 79-9 at 8.) She also believed that Pabey saw the DeLaCruzes out campaigning, because she saw him out campaigning too, even though they never approached each other. (*Id.*) Pabey acknowledged at his deposition that Joe DeLaCruz was a Pastrick supporter. (DE 76-2 at 6-7; DE 76-5 at 2-3.)

Pastrick won the 2003 Democratic primary and went on to win the general election. (DE

---

[1] Joe DeLaCruz was indicted in September 2003 for his role in a scandal involving misappropriation of city funds for unauthorized concrete-pouring projects in 1999. *See United States v. Kollintzas*, No. 3:03-CR-91, DeLaCruz Sentencing Memorandum, DE 248. On February 22, 2005, he was sentenced to 72 months in federal prison, and is currently serving his sentence in Oxford, Wisconsin. *Id.*; (DE 79-8 at 2).

76-2 at 4.) But the Indiana Supreme Court ultimately voided the results of the 2003 primary on the basis of election fraud. *Pabey v. Pastrick*, 816 N.E.2d 1138, 1151 (Ind. 2004). Consequently, a second Democratic primary was held on October 26, 2004. (DE 76-2 at 5.) The DeLaCruzes continued to support Pastrick for mayor in 2004.

**C. Plaintiff's Version of the Facts Surrounding Her Termination**

Here is where the parties' versions of the facts diverge. According to Joe DeLaCruz's sworn declaration, Pabey tried to persuade him to endorse him in the 2004 primary. Joe averred that Pabey requested a meeting with him during the second week of August 2004, and the two met alone at a McDonald's in Hammond. (DE 79-8 at 2.) The two discussed old times, including past elections, and then Pabey asked for Joe's support for mayor in the special primary in October. (*Id*.) Pabey told Joe that he thought Joe's endorsement would be influential within East Chicago's Hispanic community. (*Id*.) Joe said he would consider it and that the two would meet again to discuss it further. (*Id*.)

Joe DeLaCruz averred that a second meeting took place during the last two weeks of August. (*Id*. at 3.) Pabey told him to meet him in the parking lot of a McDonald's in Whiting, Indiana so that no one would see them. (*Id*.) When Joe arrived, Pabey told him to get into his car, and Pabey drove the two to a Puerto Rican restaurant in Chicago. (*Id*.) Once they had ordered their lunch, Pabey again reiterated his request for DeLaCruz's support. According to DeLaCruz:

> He told me that if he won the election, he would take care of my family, that he wouldn't fire my wife Myrta from her job and that he would leave my son David alone in his job at the Police Department. In return for this Pabey told me that I would have to come out in the open and endorse him for mayor and also sell some fund raising tickets for him, which would be very helpful to his campaign. I told Pabey that I would have to think about it and talk to my family. Pabey stated that he would call me in about a week and

5

that we would meet again to talk about my decision.

(*Id*.)  Then Pabey drove him back to the McDonald's parking lot.  (*Id*.)

Joe DeLaCruz stated that Pabey called him the following week and asked him to meet him again at the McDonald's in Whiting.  (*Id*.)  When he arrived, Pabey was already there.  (*Id*.)  Pabey again took DeLaCruz to the same Puerto Rican restaurant in Chicago.  (*Id*.)  Pabey then asked him if he was going to endorse him.  (*Id*.)  According to DeLaCruz:

> Pabey told me that he was going to win and if I was smart, I would help him.  George said that I should think about taking care of myself and stop helping Pastrick and his people.  I told Pabey that I couldn't support him, but that I wouldn't do anything to hurt him.  Pabey told me that not hurting him was not enough and that this was not what he wanted from me.  He wanted me to come out in the open by endorsing him.  My answer upset him and he told me that if I didn't endorse him that he couldn't promise me that my wife would keep her job.  Pabey told me to reconsider and that he would keep in touch with me during the campaign to see if I would change my mind.

(*Id*.)

DeLaCruz averred that Pabey called him again several times to ask him to change his mind, but DeLaCruz reiterated that he was already committed to supporting Mayor Pastrick.  (*Id*.)  According to DeLaCruz, "[Pabey] told me that I was leaving him no alternative but to fire my wife if he won.  I told him:  'You do what you have to do.'"  (DE 79-8 at 3.)

Pabey won the special primary and the general election.  He took office on December 29, 2004.  (DE 76-2 at 12.)  On January 12, 2005, Myrta DeLaCruz was terminated.  (DE 79-9 at 6.)  She was called into the office of Charles Pacurar, who replaced Maldonado as Controller.  (*Id*.)  According to Myrta DeLaCruz, Pacurar said, "[T]he new mayor, Mr. Pabey, would like for me to convey to you that your services are no longer needed."  (DE 79-9 at 6.)  She testified that Pacurar also referred to her as the head of the purchasing department, but she corrected him, telling him that she was merely an assistant purchasing officer and had never been a manager.

6

(*Id.*)  DeLaCruz said that Pacurar then told her, "I'm sorry that, you know, this has happened," and the meeting ended.  (*Id.*)  DeLaCruz testified that Pacurar never asked her what her job consisted of or explained why he was firing her.  (DE DE 79-10 at 4-5.)  After she was fired, she sent letters to Pabey and Pacurar asking why she was fired, but received no response.  (DE 79-10 at 4.)

**D.  Defendants' Account of Plaintiff's Termination**

According to Defendants, soon after Pabey was elected mayor, he learned that the City was in a major budget crunch.  His financial advisor, James Bennett, ran a budget analysis and determined that the City would face a shortfall of several million dollars in 2005.[2]  Pabey, acting on advice from Bennett and Pacurar, determined that some of the cuts would have to come from layoffs.  Pabey and Pacurar worked with union representatives and Human Resources personnel to conduct an initial round of layoffs in January, and more followed through the spring of 2005. (DE 71-6 at 15-16.)

Pacurar himself oversaw the transition of the Controller's office, and conducted brief, five-minute interviews of the people in the department to learn what their positions were.  (DE 71-2 at 15-16.)  He testified that this was not a formal evaluation.  (*Id.* at 16.)  He stated that he did not interview Myrta DeLaCruz, however, because she was not physically based in the Controller's office, and no one could locate her at the time he was conducted interviews.  (DE 71-3 at 7.)  Pacurar said he decided to fire DeLaCruz and eliminate her position because of the need to make payroll cuts, and because the City was not operating a centralized purchasing system.  (*Id.*; DE 71-2 at 39.)  He stated that when he asked Myrta where she worked, she said

---

[2] Plaintiff disagrees with Defendants' assertion that Pabey faced a budget deficit, and argues that Pabey actually increased spending in 2005.  (Pl.'s Facts ¶¶ 64-77.)

7

she was a clerk in the Water Department.  (*Id*.)  He acknowledged that he may have told some employees something to the effect of "the mayor no longer requires your services," but testified that the mayor did not actually make any individual determinations about whose services were going to be needed.  (DE 71-2 at 44.)

Likewise, Pabey testified that he did not make the decision to fire DeLaCruz, does not know who made the decision to fire her, and was not consulted by anyone concerning her termination.  (DE 76-5 at 3.)  Pabey said he only learned that she had been fired after the fact.  (*Id*.)  The record does not reflect that Pabey was ever asked about Joe DeLaCruz's allegation that Pabey threatened him with the loss of his wife's job, and Pabey has not affirmatively denied it.

## II. DISCUSSION

### A. Motion to Strike

Defendants move to strike several dozen paragraphs in Plaintiff's Appendix of Facts for a laundry list of reasons.  We need only address a few of the issues raised in Defendants' motion, because the Court has not considered the majority of the purportedly objectionable material in evaluating Defendants' motion for summary judgment.  Whether to grant a motion to strike is within the Court's discretion.  *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 987 (7th Cir. 2001).

First, Plaintiff moves to strike Paragraphs 16-19 of Plaintiff's Appendix of Facts, which describe the alleged conversations between Joe DeLaCruz and Pabey regarding DeLaCruz's endorsement, on the grounds that they are immaterial as a matter of law.  Plaintiff cites to *Shondel v. McDermott*, 775 F.2d 859, 863-65 (7th Cir. 1985), in which the Seventh Circuit considered a First Amendment claim alleging that the plaintiff, a government employee, was

8

fired not for her own political activity, but as retaliation against her stepfather for his political activity. Whether Joe DeLaCruz's testimony is relevant depends on whether *Shondel* forecloses Plaintiff's claim as a matter of law. If the Court concludes that *Shondel* does not require that result, the testimony is by all means relevant to the issue of why Plaintiff was fired. Thus, the issue is properly raised as a basis for summary judgment – not as an evidentiary motion. The motion to strike Paragraphs 16-19 are denied.

Defendants also move to strike the portion of Joe DeLaCruz's declaration in which he states, "Shortly after taking office as Mayor, [Pabey] had his City Controller, Charlie Pacurar, fire my wife from her job." (DE 79-8 at 4.) This statement is not based on DeLaCruz's personal knowledge, and is therefore stricken.

Defendants move to strike Paragraph 5 of Plaintiff's Appendix, which states that Myrta DeLaCruz "learned from her husband that the City was going to be implementing a new Central Purchasing Department." (Pl.'s Facts ¶ 5.) In fact, when DeLaCruz was asked how she learned about the job, she merely answered, "I had learned that they were going to implement the new department. . . ." When she was asked where she heard that from, she answered, "I think my husband told me . . . ." This is not hearsay because it is not used to prove that a new department was being formed – rather, it is only offered to show why she took the actions she took. *See Stewart v. Henderson*, 207 F.3d 374, 377 (7th Cir. 2000) (out-of-court comments about employment applicants were not hearsay, where they were offered not for the truth of the matter asserted but to demonstrate their impact on the listener's state of mind).

Defendants move to strike Paragraph 13, which states, "Although George Pabey had once supported Joe DeLaCruz, he did not thereafter. Pabey himself ran and was elected Councilman At Large prior to his election as Mayor. . . . In 2003, Pabey supported Richard Medina for

9

Councilman At Large. Pacurar was also supporting him." Plaintiff cites to her own deposition in support of these statements. Defendants argue that these statements are hearsay and lack foundation. Defendants' arguments are baffling. There is no out-of-court statement that would render these assertions hearsay. Moreover, DeLaCruz testified based on her own knowledge of her husband's campaigns for councilman at large, and she stated that she saw Pabey out on the campaign trail in 2003, so it does not appear that her statements lack foundation. Finally, given that Pabey himself admitted that he was elected councilman at large prior to his election as mayor, and that he supported Medina for councilman at large in 2003 (DE 76-2 at 5-6), it is unclear why Defendants would burden the Court with a motion to strike this information.

Because the Court has not considered the declaration of Dr. Timothy Raykovich or any of the remaining assertions in Plaintiff's Appendix of Material Facts to which Defendants' object, the remainder of the motion to strike is denied as moot.

**B. Motion for Summary Judgment**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, a court construes "all facts and reasonable inferences from the record in the light most favorable to [ ] the non-moving party." *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005).

The First Amendment protects public employees from suffering adverse job actions because of their political beliefs and associations. *Rutan v. Republican Party of Ill.*, 497 U.S. 62,

71 (1990); *Elrod v. Burns*, 427 U.S. 347, 359 (1976) ("The threat of dismissal for failure to provide [political] support unquestionably inhibits protected belief and association, and dismissal for failure to provide support only penalizes its exercise."). Although an exception exists for actions taken against "policymaking" or "confidential" employees, *see Carlson v. Gorecki*, 374 F.3d 461, 464 (7th Cir. 2004), Defendants have not argued that DeLaCruz, whose title was "assistant purchasing officer," was a policymaking employee.

In order to establish a *prima facie* case of politically motivated discharge, a plaintiff must prove by a preponderance of the evidence that his conduct was constitutionally protected, and that the protected conduct was a motivating factor in the decision to terminate him. *See Nelms v. Modisett*, 153 F.3d 815, 818 (7th Cir. 1998). The burden on the plaintiff is not insignificant; "[a] disgruntled employee fired for legitimate reasons would not be able to satisfy his burden merely by showing that he carried the political card of the opposition party or that he favored the defendant's opponent in the election." *Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir. 1981). If a plaintiff is able to demonstrate that his political affiliation was a motivating factor in his termination, the burden shifts to the defendant to prove by a preponderance of the evidence that the same actions would have occurred in the absence of the protected conduct. *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977); *Spiegla v. Hull*, 371 F.3d 928, 943 (7th Cir. 2004).

**1. Whether Plaintiff's Own First Amendment Rights Are Implicated, Or Only Those of Her Husband.**

In their opening brief, Defendants asserted that Plaintiff could not make out a *prima facie* case "based solely on a single inadmissible hearsay statement made by her husband," which she recounted in her deposition. (Def.'s Br. at 11.) Indeed, Plaintiff's repetition of her husband's

11

account of his meetings with Pabey are hearsay.  But in response, Plaintiff produced a declaration from Joe DeLaCruz himself that summarized his encounters with Pabey.  Pabey's alleged comments to Joe DeLaCruz are party admissions, and are not hearsay. Fed. R. Evid. 801(d).

Yet Defendants argue that even with Joe DeLaCruz's declaration, Plaintiff cannot make out a *prima facie* case because, if believed, it only establishes that Pabey wanted to influence Joe's political affiliation, not Myrta's.  Defendants cite to *Shondel v. McDermott*, 775 F.2d 859 (7th Cir. 1985), in which the Seventh Circuit considered the First Amendment claim of a woman who was allegedly fired as retaliation against her stepfather, a Hammond city official who had supported the losing mayoral candidate.  But *Shondel* does not compel summary judgment in this case because Plaintiff does not need third-party standing – she can assert her own First Amendment claim based on both her support for Pastrick and her support for her husband.

First, an issue of fact exists regarding whether Plaintiff was terminated because of her own support for Pastrick, not just her husband's.  *Zorzi v. County of Putnam*, 30 F.3d 885, 893-94 (7th Cir. 1994) (whether plaintiff was fired for her political support of her son-in-law, or merely for her relationship to him, was question of fact).  Plaintiff testified that she publicly supported Mayor Pastrick, put up Pastrick signs in people's homes, and talked to people about supporting Pastrick while she was out supporting her husband's campaign.  She said she often saw Pabey out on the campaign trail, and she believed he saw her too.  Pabey admitted that he knew that Joe DeLaCruz did not support him, and the jury could fairly infer that he knew that Myrta did not support him either.

Obviously, the key piece of evidence for Plaintiff is her husband's testimony that Pabey tried to obtain his endorsement by threatening Plaintiff's job.  Construed most narrowly, Pabey's

12

alleged threats were directed toward the political activity of Joe, not Myrta.  But this ignores the practical reality that a politician and his or her spouse frequently act as a single unit with respect to their public political affiliation, if not their private political beliefs.  *See Soderbeck v. Burnett County*, 752 F.2d 285, 287 (7th Cir. 1985) (upholding finding that defendant's "only reason for firing [plaintiff] was that [plaintiff] was the wife *and presumed ally* of his political adversary" (emphasis added)); *Shondel*, 775 F.2d at 865 (distinguishing *Soderbeck* on the basis that jury could have concluded that Ms. Soderbeck was fired for her own political beliefs as well as because of who her husband was).  Had the threats been successful in winning Joe's support by coercion, it seems likely that they would have had the same coercive effect on Myrta.  Stating it a different way, a jury could conclude that Pabey might not have fired Myrta had she bucked her husband and supported Pabey.  This suggests that it was at least partially her protected conduct that motivated her termination.

Second, even assuming that Joe DeLaCruz was the target of Defendants' retaliation, Plaintiff still has a claim for a violation of her right to associate with her husband.  The Supreme Court has explained that the Constitution protects two distinct forms of free association.  The first, freedom of expressive association, arises from the First Amendment and ensures the right to association for the purpose of engaging in activities protected by the First Amendment.  *See Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984); *Montgomery v. Stefaniak*, 410 F.3d 933, 937 (7th Cir. 2005).  That is the right that is at play here.[3]  *Roberts*, 468 U.S. at 618.

---

[3] The second type of freedom, that of intimate association, protects the right "to enter into and maintain certain intimate human relationships."  *Roberts*, 468 U.S. at 617-18.  Because the freedom of intimate association is seen as a "fundamental element of personal liberty," it is protected by the Due Process Clause of the Fourteenth Amendment.  Here, DeLaCruz has not argued that the Defendants' actions in this case violated the right of intimate association as found in the Due Process clause.  I express no opinion on that matter, and since the plaintiff has not

13

Plaintiff's complaint alleged a violation of her First Amendment rights "on account of her political support for former Mayor Robert A. Pastrick, Pabey's opponent, *and because of her support for Joe DeLaCruz, her husband*, who was a member of the East Chicago City Council and also an outspoken opponent of Pabey." (Compl. ¶ 1 (emphasis added).) Thus, the allegation specifically asserts that she was fired because of her association with her husband. If a jury were to believe Joe DeLaCruz, then Pabey violated Plaintiff's right to associate with her husband – a right which arises from the First Amendment and ensures the right to association for the purpose of engaging in activities protected by the First Amendment. *Roberts*, 468 U.S. at 617-18.

### 2. Other Arguments

Defendants also argue that Pabey's alleged comments to Joe DeLaCruz were just "stray remarks" made months before DeLaCruz's termination, and therefore cannot be properly viewed as a motivating factor. This is absurd. The Court cannot weigh the credibility of witnesses on summary judgment. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). But taking Joe DeLaCruz's account as true, as we are required to do at this stage, a reasonable jury could certainly conclude that Myrta lost her job because she and her husband refused to switch their loyalties. Pabey's comments to Joe were hardly "stray remarks" – they were a direct promise to ensure Myrta's job security if Joe endorsed Pabey, and a direct threat to her employment if he didn't. If a direct *quid pro quo* offer of continued employment in exchange for political support does not show political motivation, what would? Nor does the four-month time lapse between DeLaCruz's alleged conversations with Pabey and Plaintiff's actual termination dilute their

---

clearly articulated that theory, it is waived.

14

relevance; assuming Pabey intended to make good on his alleged threat, he would not have had the authority to do so until he assumed the office of mayor a mere two weeks prior to DeLaCruz's firing.[4]  Thus, Plaintiff has made a *prima facie* case that her termination was politically motivated.

Finally, Defendants argue that Plaintiff has failed to demonstrate that the articulated reason for her termination was pretextual.  (Reply at 9.)  Defendants cite to evidence that the central purchasing department never fully got off the ground, and that the whole idea went out the window when Pabey took office.  They put Plaintiff's termination in context with the series of broad layoffs and terminations that they claim were undertaken to eliminate an anticipated budget crisis.  They point to Pacurar and Pabey's testimony, in which they assert that Pacurar made the decision to fire Plaintiff independently based on his determination that her position was not needed, and without any input or influence from Pabey.

But a reasonable jury could conclude that Defendants haven't met their burden of persuasion in demonstrating that Plaintiff would have been fired anyway for legitimate reasons. *Mt. Healthy*, 429 U.S. at 287.  Issues of fact exist that only a jury can resolve.  A jury need not credit the testimony of Pabey and Pacurar; indeed, if they believe the account of Joe DeLaCruz,

---

[4] Defendants cite to *McClure v. Cywinski*, 686 F.2d 541, 546 (7th Cir. 1982), suggesting that *McClure* affirmed summary judgment where the plaintiff's supervisor commented "that plaintiff should not be so politically active or he would 'get rid of him later.'" (Br. at 12.)  This overstates *McClure*.  McClure overheard his supervisor say, "McClure is just window dressing.  We'll get rid of him later," which he interpreted to mean that he was not politically active enough.  686 F.2d at 543.  The Court found that the "window dressing" comment was not as probative as it might otherwise have been because so much time had elapsed between the comment and the firing.  But it also noted that the supervisor knew of McClure's attitude toward politics when he hired him.  Ultimately, the Court concluded that there was no direct evidence that McClure's firing was motivated by his refusal to get involved with politics.  This is a far cry from this case, in which a direct threat was allegedly carried out within two weeks of Pabey's swearing in as mayor.

15

they might conclude that the two were lying.  Of course, they could believe Joe DeLaCruz but draw the conclusion that Pabey never communicated a retaliatory motive to Pacurar, and Pacurar thus acted independently.  Or they might not credit Joe DeLaCruz at all.  In any event, because factual issues exist, this case is not ripe for summary disposition.[5]

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [DE 69] is **DENIED**.  Defendants' Motion to Strike [DE 83] is **DENIED** except with respect to Joe DeLaCruz's statement that Pabey "had his City Controller, Charlie Pacurar fire [Plaintiff] from her job." [DE 79-8 at 4.]  All further settings in this action are **AFFIRMED**.

**SO ORDERED**

ENTERED:  October 18, 2007

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT

---

[5] The Court notes that while Defendants Pabey and Pacurar pled a qualified immunity defense in their answer (Answer ¶¶ 2-3), they did not raise it at summary judgment, and therefore, we express no opinion regarding whether Defendants are entitled to qualified immunity from suit in this case.